[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11638

_____

D.C. Docket No. 1:16-cv-21769-KMW


IRINA TESORIERO,

Plaintiff-Appellant,

versus

CARNIVAL CORPORATION,
d.b.a. Carnival Cruise Line,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 14, 2020)

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

GRANT, Circuit Judge:

When Irina Tesoriero sat on the vanity chair in her Carnival Cruise ship

cabin, she was in for a terrible surprise—it collapsed. While she and her husband

waited for help to arrive, they saw that a leg had fallen off the chair. Observing no other outward defects, they took some photos of the pegs that normally held the chair together, which became visible only after the chair broke. Still waiting for help, they let in a steward who came to replace the broken chair with a fresh one. Finally, the Tesorieros took matters into their own hands and went directly to the onboard medical center; there, they were told that Tesoriero's arm was not broken, and an x-ray was taken to be sure. The onboard doctor treated her with Tylenol, ice, and a sling and sent the couple on their way.

Understandably frustrated that her injury continued to bother her, Tesorerio sought treatment at home after the cruise. Still no broken arm, but she was suffering from a terrible case of medial epicondylitis and ulnar neurapraxia—a diagnosis Tesoriero describes as tennis elbow. Tesoriero was also understandably frustrated with Carnival, and filed suit against the cruise line, alleging that it had failed to inspect and maintain the cabin furniture (or else warn her of the danger the chair posed). Perhaps aware of the difficulty she may have in showing that Carnival had notice about the chair's dangers (especially given the photos suggesting no outward defects), she fought the usual notice requirement on two fronts: first, she alleged that res ipsa loquitor applied and meant that she did not need to show notice, and second, she claimed that Carnival should be sanctioned with an adverse inference on notice because it failed to preserve the broken chair.

The district court granted summary judgment in favor of Carnival. The court found that the cruise line did not have notice that the chair was dangerous, that res ipsa loquitor did not apply, and that the failure to save the chair was not

2

sanctionable.  Tesoriero now appeals those three conclusions.  After careful review, we agree with the district court that Tesoriero failed to show that Carnival had actual or constructive notice that the chair was broken.  Unlike the district court, we decline to consider whether res ipsa loquitor applies; even if it does, that doctrine cannot cure a defect in notice.  Nor can the requested spoliation sanctions; even setting aside whether we think the chair itself could have provided any evidence of notice, Carnival's failure to preserve the chair was not shown to be in bad faith and is therefore not sanctionable.  For all those reasons, we affirm.

## I.

On June 26, 2015, Irina Tesoriero was getting ready for dinner in her cabin aboard the Carnival *Splendor*.  She pulled a wooden chair "about a foot" away from the vanity and attempted to sit down, but it collapsed beneath her.  Her right collarbone struck the vanity and her right arm was injured; initially, she believed that her arm was broken.  Her husband, Joseph Tesoriero, witnessed the incident and called the front desk for help.

While waiting for help to arrive, Joseph inspected and photographed the chair.  He saw that it "did not have any obvious or observable outward defects" before it broke.  He also saw that the right front leg, which had been attached to the seat by pegs, had fallen off, and that the glue on the pegs was dried and chipped.  In his opinion, it "was obvious from the appearance of the pegs—visible only after it fell apart—that the pegs had been unglued and loose for a long time."  A steward came to the cabin, took away the broken chair, and replaced it with a new one.

3

The chair was later disposed of by an unknown crew member because it could not be fixed.

Tesoriero and her husband waited around for medical staff, and went to the onboard medical center when in-cabin aid was not forthcoming. Tesoriero was then examined by a physician, who told her (correctly, as it turns out) that she did not have a fracture and gave her Tylenol, ice, and an arm sling. Although an x-ray was taken, it was sent to Miami for review because it could not be read on the ship. While at the medical center, Joseph Tesoriero completed a "passenger injury statement" on his wife's behalf. The statement collected basic information, including the time, date, and location of the incident.

In accordance with Carnival's policy, because Tesoriero's injury only required first aid—and because she did not request an accident report—the medical staff classified the accident as "non-reportable." That meant that the security department, which is responsible for investigating accidents and, when necessary, preserving evidence, was asked to do neither. The room stewards, on the other hand, dispose of broken furniture that cannot be repaired and only preserve it if asked to do so. That general policy was followed here, so the chair was not preserved.

After Tesoriero disembarked, she received confirmation that her x-ray results did not show a broken arm. But the arm was not ready to make peace, and Tesoriero continued to experience pain and swelling. She was ultimately diagnosed with medial epicondylitis and ulnar neurapraxia, which she described as "tennis elbow." Tesoriero struggled to get her arm back to full strength,

4

undergoing injections, therapy, and surgery, apparently with little success; she says that she continued to require medical treatment into this litigation, and that she struggles with basic tasks like cooking, taking out the garbage, and carrying groceries.

A little less than a year after the cruise, Tesoriero filed a complaint against Carnival in the Southern District of Florida, asserting a single claim of negligence based on Carnival's alleged failure to inspect and maintain the cabin furniture and failure to warn passengers of the unsafe condition. Both parties moved for summary judgment. For its part, Carnival invoked a familiar defense, arguing that it was not responsible for Tesoriero's injury because it had neither actual nor constructive knowledge that the chair was unsafe prior to the incident.

During discovery, Tesoriero deposed the housekeeping manager who was aboard the ship at the time of the accident. The manager testified that stewards cleaned the cabins daily and were responsible for inspecting the cabin furniture. He explained that that process involved physical movement of the chairs in the course of vacuuming, as well as visual inspection of the entire cabin, including the furniture, for signs of damage. Damaged furniture was reported to a floor supervisor, who was tasked with making a record of the problem and addressing it. When repairs were possible, they were made, and when repairs were not possible, the items were disposed of.

Tesoriero's arguments—considering both her response to Carnival's motion and her own motion for summary judgment—were threefold. *First*, she said that the condition of the chair, coupled with Carnival's regular inspections of the cabin

5

furniture, was enough to constitute constructive notice of the dangerous condition.[1] *Second*, she contended that the doctrine of res ipsa loquitur applied and eliminated the need for her to show that Carnival had notice in any event. *Finally*, she argued that Carnival's disposal of the broken chair amounted to spoliation of evidence and entitled her to an inference that Carnival had notice of the risk-creating condition.

A magistrate judge issued a report and recommendation on the competing motions. He said that the evidence demonstrated that "no reasonable inspection could have discovered the dangerous condition without first deconstructing the cabin chair." As to the res ipsa loquitur issue, the magistrate first concluded that the doctrine, if applicable, would indeed absolve Tesoriero of any need to show that Carnival had actual or constructive notice of the dangerous condition. Ultimately though, he decided that the doctrine did not apply because a collapsing chair can easily happen even without negligence. Finally, the magistrate declined to sanction Carnival for spoliation of evidence, seeing no evidence that Carnival reasonably anticipated litigation following the accident.

Over Tesoriero's objections, the district court affirmed and adopted the magistrate judge's report and recommendation and granted Carnival summary judgment. In adopting the recommendation, the court specifically ruled that res ipsa loquitur did not apply and that the facts surrounding the disposal of the broken

---

[1] At the trial level, Tesoriero pressed additional arguments. She said that Carnival had constructive notice because of (1) a prior accident involving a collapsing metal balcony chair; and (2) internal documents from Carnival regarding the repair and replacement of cabin chairs. She also contended that her negligent maintenance claim did not require a showing of notice. The district court rejected all these arguments, and Tesoriero does not challenge those rulings on appeal.

chair did "not amount to spoliation such that an adverse inference is warranted." Tesoriero appealed.

## II.

"We review a district court's grant of summary judgment *de novo*. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.4 (11th Cir. 2019) (en banc) (internal citation omitted). We view "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (quotation marks and citation omitted). "We review the district court's decision regarding spoliation sanctions for abuse of discretion." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005). We "may affirm for any reason supported by the record, even if not relied upon by the district court." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1009 (11th Cir. 2016) (citation omitted).

## III.

On appeal, Tesoriero raises three arguments. *First*, she argues that her husband's observations about the broken cabin chair, coupled with Carnival's admitted regular inspections, show that Carnival had constructive notice that the chair was dangerous. *Second*, she argues that even if she cannot establish notice, the doctrine of res ipsa loquitur saves her claim because it eliminates the ordinary

7

notice requirement.  *Finally*, she argues that she is entitled to an adverse inference against Carnival on the notice requirement in any event because Carnival spoliated evidence when it discarded the chair.

## A.

Before turning to Tesoriero's constructive notice argument, we should say a few words about the background legal principles in play.  "Maritime law governs actions arising from alleged torts committed aboard a ship sailing in navigable waters."  *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019).  "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."  *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 838 (11th Cir. 2010) (quoting *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986)).  And in the absence of an established federal maritime rule, we "may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate."  *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (applying the "general common law and in particular the Restatement (Second) of Torts" to "determine the law of maritime trespass"); *see also Wells v. Liddy*, 186 F.3d 505, 525 (4th Cir. 1999) ( The "general maritime law may be supplemented by either state law or more general common law principles." (internal citation omitted)).  For maritime tort cases in particular, "we rely on general principles of negligence law."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citation omitted).

A few key principles have developed to guide our analysis of these torts. A cruise line "is not liable to passengers as an insurer," but instead is liable to passengers "only for its negligence." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (citation omitted). The elements of a maritime negligence claim, in turn, are well-established, and stem from general principles of tort law. A cruise passenger must show that "(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm." *Guevara*, 920 F.3d at 720 (quoting *Chaparro*, 693 F.3d at 1336).

Here, the first question for us is the scope of Carnival's duty to Tesoriero. Shipowners owe their passengers a duty of "ordinary reasonable care under the circumstances." *Keefe*, 867 F.2d at 1322. This standard requires, "as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition," at least so long as "the menace is one commonly encountered on land and not clearly linked to nautical adventure." *Id.*; *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990). In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it. Liability for a cruise ship operator thus "'hinges on whether it knew or should have

9

known' about the dangerous condition." *Guevara*, 920 F.3d at 720 (quoting *Keefe*, 867 F.2d at 1322). [2]

We have identified at least two ways that constructive notice can be shown. *First*, a plaintiff can establish constructive notice by showing that a "defective condition existed for a sufficient period of time to invite corrective measures." *Id.* (alterations adopted) (quoting *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988)). *Second*, a plaintiff can show evidence of "substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." *Id.* (quotation marks and citation omitted). On the other hand, the fact that the cruise line runs the ship is not enough—constructive notice of a risk cannot be imputed merely because a shipowner "created or maintained" the premises. *Everett*, 912 F.2d at 1358–59.

Here, the evidence does not show—and Tesoriero does not contend—that Carnival had actual notice that the chair was dangerous. Nor do we have any evidence of substantially similar incidents involving wooden cabin chairs. Tesoriero's sole argument that Carnival had constructive notice relies on her husband's observations about the chair, along with Carnival's furniture-inspection policy. In her view, these facts demonstrate that Carnival should have known about

---

[2] This notice requirement is not unique to maritime law. For example, in a traditional negligence action against a landowner by an invitee, a "defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 61, at 426–27 (5th ed. 1984). So, for example, the "mere fact of the presence of a banana peel on a floor may not be sufficient to show that it has been there long enough for reasonable care to require the defendant to discover and remove it," while a "black, flattened out and gritty" peel might lead to a different conclusion. *Id.* § 39, at 243 (citation omitted). The key is notice.

10

the chair's "hair-trigger condition." For Tesoriero to prevail on this theory, we would need to conclude that the chair existed in a defective condition "for a sufficient period of time to invite corrective measures." *Guevara*, 920 F.3d at 720. A defect, however, must be reasonably detectable for it to "invite" corrective measures, and we cannot see how the chair's condition here issued any such invitation.

To begin, Carnival's "regular inspections weigh against a finding of constructive notice" that the chair was dangerous—not in favor of that finding. *Id.* at 723 n.8; *see also Monteleone*, 838 F.2d at 66. The daily inspection policy required stewards to report damaged furniture to a floor supervisor, and the supervisor was then responsible for documenting and addressing the issue. The lack of a report noting structural damage to Tesoriero's cabin chair—or any wooden cabin chair for that matter—indicates that the chair was not in a condition that invited corrective measures.

And at a more basic level, Tesoriero's constructive notice argument is undermined by her own evidence. In Joseph Tesoriero's affidavit describing the incident, he observed that the glue on the pegs holding the chair together "appeared to be dried out or chipped away" and that it was "obvious" that "the pegs had been unglued and loose for a long time." But those observations, however obvious they may have been after the fall, could not have been made by the crew before the chair came apart. Joseph Tesoriero himself admitted that—before its collapse—the "chair did not have any obvious or observable outward defects." In fact, he added that the condition of the pegs was "visible only after it fell apart."

11

The photographic evidence submitted by Tesoriero only reinforces her husband's observations. Though the pictures cannot reveal the state of the glue, it appears that the leg and seat of the chair were held together by four pegs that fit into opposing holes. With the chair intact, its cloth-covered frame would have enveloped and obscured the peg-and-hole assembly. So, consistent with Joseph Tesoriero's testimony, any defect relating to dried or chipped glue could not have been visible until the chair came apart.

Even beyond the lack of any outwardly visible defect, Tesoriero's characterization of the chair's "hair-trigger condition" is weakened by her own testimony. In her deposition, Tesoriero testified that she moved the chair back from the vanity, evidently without noticing any problem; the issue only became apparent after the chair broke under her full weight.

The combined effect of this evidence does not support a reasonable inference that Carnival should have known about the danger. Quite the opposite: it supports an inference that the defect in the chair was hidden, was not readily observable by sight or touch, and could only be discovered by either disassembling the chair to view the pegs or stress testing it. An implicit legal requirement that all furniture on a cruise ship be either disassembled or subjected to daily stress testing would be remarkable. Rather than establishing that Carnival should have known of the chair's defective condition, the evidence supports the cruise line's assertion that moving the chair during cleaning and conducting routine visual inspections did not reveal a risk-creating condition.

B.

That brings us to res ipsa loquitur.  Tesoriero argues that even if she cannot show that Carnival had notice of the chair's dangerous condition, the cruise line can still be held liable under that doctrine because it eliminates the usual notice requirement.  Her theory, though, fails on several fronts: it not only misunderstands the relationship between duty and notice in a tort claim but would also dramatically expand the doctrine of res ipsa loquitur, which "in the admiralty context is not totally unique but neither is it routine."  *United States v. Baycon Indus., Inc.*, 804 F.2d 630, 633 (11th Cir. 1986).

Res ipsa loquitur—Latin for "the thing speaks for itself"—is an evidentiary doctrine that permits a trier of fact to infer a defendant's negligence from unexplained circumstances.[3]  *Sweeney v. Erving*, 228 U.S. 233, 238–39 (1913); *see also Johnson v. United States*, 333 U.S. 46, 49 (1948).  In other words, it is a form of circumstantial evidence.  *See Sweeney*, 228 U.S. at 240; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 39, at 243 (5th ed. 1984); *Restatement (Second) of Torts* § 328D cmt. b (Am. Law Inst. 1965).  For the doctrine to apply, the plaintiff needs to show that "(1) the injured party was without fault, (2) the instrumentality causing the injury was under the exclusive control of the defendant, and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence."  *Baycon*, 804 F.2d at 633.

---

[3] As it turns out, the phrase itself does not "speak for itself"—the Latin terminology has long been criticized for adding unnecessary mystery "to a relatively simple problem" of circumstantial evidence.  *Restatement (Second) of Torts* § 328D cmt. a (Am. Law Inst. 1965).

13

But before we address the application of the doctrine to the facts of this case, we need to decide a threshold question that has divided the district courts in our Circuit—whether a maritime passenger who fails to establish the shipowner's notice of a dangerous condition can still survive summary judgment by invoking res ipsa loquitur. If not, the lack of notice is dispositive: no notice, no negligence. This is an open question in our Circuit.

Indeed, district courts have reached conflicting conclusions on the issue. In *Adams v. Carnival Corp.*—a maritime negligence action arising from a deck chair collapsing under a passenger—the district court considered the effect of res ipsa loquitur on the notice requirement. No. 08-22465-CIV, 2009 WL 4907547, at *1, *5 (S.D. Fla. Sept. 29, 2009). The evidence showed that Carnival conducted routine inspections of the chairs, and the court concluded that the plaintiff presented no evidence that the defect was "even capable of detection." *Id.* at *4. There, as here, the plaintiff attempted to get around the usual notice requirement with res ipsa loquitur. Ultimately, the district court held that the plaintiff's invocation of res ipsa loquitur did "not obviate the need to show that Carnival had notice." *Id.* at *5. "Without specific facts demonstrating, at least, that the purported defect was detectable with sufficient time to allow for corrective action," the case could not proceed to a jury. *Id.*

Since *Adams*, though, the tide has turned and a majority of the district courts in this Circuit have reached the opposite conclusion (including in this case).[4] A

---

[4] Cases from other jurisdictions take a variety of approaches on res ipsa loquitur and notice. Following in *Adams*' footsteps, "several cases in the maritime context" support an argument

leading example is *Millan v. Celebration Cruise Operator, Inc.*, where a piece of the ceiling fell and hit a passenger. 212 F. Supp. 3d 1301 (S.D. Fla. 2015). After initially distinguishing *Adams* on its facts, the court went on to conclude that "a plaintiff is not required to show the defendant's actual or constructive notice of the defective condition in order to raise a *res ipsa loquitur* inference of negligence under maritime law." *Id.* at 1306. In support of that conclusion, the district court cited our opinion in *United States v. Baycon Industries* as finding "no requirement of actual or constructive notice for *res ipsa* in maritime negligence action." *Id.* at 1305–06 (citing *Baycon*, 804 F.2d at 632–35). The problem is that *Baycon* does not say that (or even hint at it). Nevertheless, many district court opinions have embraced this view in the years that followed, often with little more than a citation to *Millan* itself. *See, e.g.*, *Morhardt v. Carnival Corp.*, 304 F. Supp. 3d 1290, 1296 (S.D. Fla. 2017) (citing *Millan* and noting that "courts in this district have held that

---

"that a predicate for a *res ipsa loquitur* finding is that the Defendant had notice of the defective condition." *Tillson v. Odyssey Cruises*, No. 08-10997-DPW, 2011 WL 309660, at *7 (D. Mass. Jan. 27, 2011). Others have concluded that res ipsa loquitur is incompatible with a notice requirement. *See, e.g.*, *Krivokuca v. City of Chicago*, 73 N.E.3d 525, 532 (Ill. App. Ct. 2017) (holding that res ipsa loquitur was unavailable when statute required showing actual or constructive notice); *Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55, 60 (D.C. 2008) (This "court and others have held that in cases in which notice is an essential element of a plaintiff's claim, *res ipsa loquitur* is inapplicable because it is inconsistent with the requirement of notice."). There is also considerable support for the opposite proposition. *See, e.g.*, *Smith v. United States*, 860 F.3d 995, 998 n.2 (7th Cir. 2017) (noting that "the inference triggered by the res ipsa loquitur doctrine would include the proposition that the defendant had notice of the defective nature of the instrumentality that caused the plaintiff's injury"); *Miller v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 317 F.2d 693, 696 (6th Cir. 1963) ("If application of the doctrine permits an inference of *negligence*, such inference must necessarily include all the essential elements of negligence, including here an inference that defendant had actual or constructive knowledge of the defective condition."); *Burns v. Otis Elevator, Co.*, 550 So. 2d 21, 22 (Fla. Dist. Ct. App. 1989) (actual or constructive notice of the defect is "immaterial" if the conditions for the res ipsa doctrine are established).

15

a plaintiff in a maritime action based on negligence is not required to prove that the shipowner had notice of the defective condition when the doctrine of *res ipsa loquitur* applies"); *O'Brien v. NCL (Bahamas) Ltd.*, 288 F. Supp. 3d 1302, 1314 (S.D. Fla. 2017).

In resolving the apparent uncertainty within our Circuit about notice and res ipsa loquitur, we return to first principles.[5]  "Res ipsa loquitur leads only to the conclusion that the defendant has not exercised reasonable care, and is not itself any proof that he was under a duty to do so."  Keeton et al., *supra*, § 39, at 255.  "It does not permit the imposition of liability without fault, and therefore does not help to establish the duty of care, which is essential to every negligence case."  1 Stuart M. Speiser, *The Negligence Case: Res Ipsa Loquitur* § 3:1, at 90 (1972).  That means the doctrine does not apply unless the alleged negligence is "within the scope of the defendant's duty to the plaintiff."  *Restatement (Second) of Torts* § 328D (Am. Law Inst. 1965).  That same duty requirement is found in the res ipsa loquitur doctrines of many states, and at least one federal circuit court has already stated that it applies in the admiralty context as well.  *See, e.g.*, *Trigg v. City & County of Denver*, 784 F.2d 1058, 1060 (10th Cir. 1986) (applying Colorado law); *Biggs v. Logicon, Inc.*, 663 F.2d 52, 54 (8th Cir. 1981) (noting in an admiralty case that res ipsa loquitur only applies if the "negligence is within the scope of the defendant's duty to the plaintiff"); *Moon v. Dauphin County*, 129 A.3d 16, 26 (Pa.

---

[5] Our Circuit is not alone in its uncertainty—at least as a general matter.  Prosser and Keeton, for instance, describe "an uncertain 'doctrine' of res ipsa loquitur, which has been the source of some considerable trouble to the courts."  Keeton et al., *supra*, § 39, at 243–44.

16

Commw. Ct. 2015); *Crum v. Equity Inns, Inc.*, 685 S.E.2d 219, 229 (W. Va. 2009); *Linnear v. CenterPoint Energy Entex/Reliant Energy*, 966 So. 2d 36, 44 (La. 2007).

So res ipsa loquitur can allow a jury to infer from circumstantial evidence that the defendant must have breached its duty—but it cannot show that a defendant must have had that duty in the first place. The Supreme Court's description of the doctrine as "an aid to the plaintiff in sustaining the burden of proving *breach* of the duty of due care" is consistent with that understanding—a duty can only be breached if it exists. *Commercial Molasses Corp. v. N.Y. Tank Barge Corp.*, 314 U.S. 104, 113 (1941) (emphasis added). It would be quite odd to say that a party must have had a duty, but for reasons that cannot be discovered. As another court put it, "*res ipsa loquitur* provides no assistance to a plaintiff's obligation to demonstrate a defendant's duty, that a breach of that duty was a substantial factor in causing plaintiff harm, or that such harm resulted in actual damages. However, *res ipsa loquitur* does aid a plaintiff in proving a breach of duty." *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1071 n.15 (Pa. 2006). Well put.

For instance, a trespasser, to whom no duty of care was owed by a landowner, may not establish a landowner's liability for a defective condition by relying on res ipsa loquitur. *Restatement (Second) of Torts* § 328D cmt. j (Am. Law Inst. 1965). Similarly, if a statute provides that automobile drivers are only liable to their passengers for "wilful, wanton, or reckless conduct," a passenger relying on res ipsa loquitur to show a breach of ordinary care cannot establish liability under the higher statutory duty. *Id.* In other words, res ipsa loquitur "does not eliminate a

17

plaintiff's obligation to prove that the defendant owed a duty to the plaintiff in the first place." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 901 (4th Cir. 2003).

With this foundation laid, our resolution of the notice issue is straightforward. If res ipsa loquitur cannot eliminate the duty requirement, it cannot eliminate the notice requirement; the two are intertwined in a maritime negligence tort. *Guevara*, 920 F.3d at 720. Maritime passengers are owed a duty of "ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322; *Everett*, 912 F.2d at 1358. And we have been clear that the scope of a cruise line's "duty to protect its passengers is informed, if not defined, by its knowledge of the dangers they face onboard." *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1044 (11th Cir. 2019).

The *Baycon* case, no matter how frequently it is cited, does not change that equation. In fact, it does not even use the term notice or explicitly consider the issue before us today. Instead, *Baycon* deals with shipowner liability for sunken vessels. *Baycon*, 804 F.2d at 631–32. The suit was brought under the Rivers and Harbors Act of 1899, which imposed a duty on shipowners to not "voluntarily or carelessly" sink a vessel. *Id.* at 631, 633 n.5 (citation omitted). Because the forty-year-old, long-idle ship in that case sunk on a clear and calm night, we allowed the doctrine of res ipsa loquitur to supply the inference that its sudden sinking was caused by negligence. *Id.* at 634. That is all.

Even so, district courts in this Circuit have sometimes concluded—perhaps from the lack of any discussion about notice—that *Baycon* demonstrates that res ipsa loquitur eliminates any notice requirement. But that is just not right. To begin, though *Baycon* does not specifically address notice, the Court's discussion of the dredge's age, the length of time since it had been in service, and the preparation for travel without assessing "the condition of the external hull below the water line" rings in the tones of constructive notice. *Id.* And more to the point, absent so much as a word about notice in that earlier precedent on statutory negligence for sunken vessels, we cannot jump to the conclusion that res ipsa loquitur obviates the well-known notice requirement for cruise ship negligence cases brought by passengers.

*        *        *

In sum, a plaintiff who relies on res ipsa loquitur to show a breach of duty still bears the burden of proving that a duty existed in the first place. And because notice is an integral part of duty, a passenger who relies on res ipsa loquitur bears the burden of showing that the cruise line had notice. As it applies to this case, then, the doctrine does not help Tesoriero. Carnival's duty was to protect Tesoriero from dangerous conditions that it was aware of or should have been aware of. But as we have already explained, Tesoriero's own evidence shows that the chair's defect was hidden. Because res ipsa loquitur has no effect on our duty analysis, Tesoriero's failure to establish Carnival's actual or constructive notice is fatal to her case. And that is true whether or not res ipsa loquitur would otherwise apply to a broken chair fact pattern—a question we need not consider given our resolution of the notice issue.

19

So, although we conclude that the district court erred by holding that res ipsa loquitur obviates the notice requirement, we ultimately reach the same result: Tesoriero's failure to prove that Carnival had notice cannot be cured by her reliance on res ipsa loquitur.

## C.

Finally, we consider Tesoriero's argument that Carnival spoliated evidence by disposing of her broken cabin chair. She maintains here, as she did below, that Carnival should be sanctioned with an adverse inference that the cruise line had notice of the defect—an inference that would defeat its motion for summary judgment.

The district court declined to impose Tesoriero's requested sanction because, in its view, Carnival did not reasonably anticipate litigation, and therefore did not have a duty to preserve the chair. This was incorrect, and the district court's reasoning is undermined by Carnival's own admission. During discovery, in its response to a request for admissions under Federal Rule of Civil Procedure 36, Carnival admitted that it anticipated litigation "immediately after the incident was reported." "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Because the record does not indicate that Carnival's admission was withdrawn or amended, we must conclude that the district court erred in holding that Carnival did not anticipate litigation.

But anticipation of litigation is not the standard for spoliation sanctions— bad faith is. So even though the district court incorrectly concluded that Carnival

20

did not anticipate litigation, the court's decision not to impose sanctions for spoliation would still be appropriate absent evidence that Carnival acted in bad faith. And even if bad faith were shown, the court's decision not to impose sanctions would be appropriate if "the practical importance of the evidence" was minimal. *Flury*, 427 F.3d at 945; *cf. Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (no spoliation claim under Florida law without a "significant impairment in the ability to prove the lawsuit"); *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010) (evidence must be "crucial to the movant being able to prove its prima facie case or defense" to establish spoliation). We "may affirm for any reason supported by the record, even if not relied upon by the district court." *Lage*, 839 F.3d at 1009.

Spoliation is "defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Green Leaf Nursery*, 341 F.3d at 1308 (11th Cir. 2003) (quotation marks and citation omitted). In some circumstances, a party's "spoliation of critical evidence may warrant the imposition of sanctions." *Flury*, 427 F.3d at 945. Because spoliation is an evidentiary matter, "federal law governs the imposition of spoliation sanctions." *Id.* at 944. Sanctions for spoliation may include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Id.* at 945.

When deciding whether to impose sanctions, a number of factors are relevant: "(1) whether the party seeking sanctions was prejudiced as a result of the

21

destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (citing *Flury*, 427 F.3d at 945).

Spoliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence. Indeed, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). And bad faith "in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). This consideration is key in evaluating bad faith because the party's reason for destroying evidence is what justifies sanctions (or a lack thereof). "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) (citation omitted).[6]

Some of our earlier cases illustrate the difference between bad faith and mere negligence. In *Bashir v. Amtrak*, we held on summary judgment that the unexplained absence of a train's speed record tape did not warrant an adverse inference that the train was traveling at an excessive speed when it struck and killed a pedestrian. 119 F.3d at 931. We would "not infer that the missing speed tape

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

contained evidence unfavorable to appellees unless the circumstances surrounding the tape's absence indicate bad faith, e.g., that appellees tampered with the evidence." *Id.* Because plaintiffs produced no evidence that the train company purposefully lost or destroyed the tape, we concluded that there was no showing of bad faith. And finding no bad faith, we declined to impose spoliation sanctions against the train company, which had already produced significant evidence that the train was not exceeding the statutory speed limit. *Id.* at 931–32.

In contrast, bad faith was evident, and spoliation sanctions were appropriate, in *Flury v. Daimler Chrysler Corp.* 427 F.3d at 944–47. There, the plaintiff sued a vehicle manufacturer alleging that he was injured when his car's airbags did not inflate during a crash. *Id.* at 940. Shortly after the lawsuit was filed, the defendant sent a letter requesting the location of the vehicle so that it could conduct an inspection. *Id.* at 941–42. The plaintiff did not respond to the letter. Although he was "fully aware that defendant wished to examine the vehicle," he "ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal." *Id.* at 945. It is no surprise that we found bad faith on those facts.

But the facts here are different, and Tesoriero has not established that Carnival's failure to preserve the chair rose to the level of bad faith. Nothing in this record indicates that Carnival disposed of the broken chair in a manner inconsistent with its policies or that the policies themselves somehow establish bad faith.[7] And

---

[7] It is unclear to us how—as the dissent suggests—three district court cases that declined to offer any relief based on spoliation or discarding evidence in accordance with Carnival's policies

unlike the plaintiff in *Flury*, Carnival cannot be said to have been "fully aware" of Tesoriero's desire to further inspect the chair. *See Flury*, 427 F.3d at 945; *see also Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009) (concluding that bad faith can be established by circumstantial evidence only when the "act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator").

The record shows that the cabin steward came to Tesoriero's cabin soon after the accident to remove and replace the broken chair. The steward was not there to investigate the accident, but simply to replace the chair. Of course, as the housekeeping manager aboard the Carnival *Splendor* explained, if Tesoriero had requested that the chair be saved, the steward would have done so. He also would have done so if the security department had requested retention. But without a request from Tesoriero or the security department, the chair was taken to maintenance for repair. When the maintenance department could not repair it, the chair was disposed of.

Even if the disposal of the chair were somehow improper, we do not see how it would give rise to anything more than an act of mere negligence. The security department at Carnival is responsible for investigating accidents and preserving evidence. Again, Tesoriero offers no evidence that she ever requested that the chair be preserved. Nor was the security department informed by the medical staff that a

---

should persuade us that sanctions are appropriate here. Dissenting Op. at 11–12. The point only sharpens when we consider that two out of the three cases involved collapsing chairs. *See Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962 (S.D. Fla. July 23, 2010); *Hickman v. Carnival Corp.*, No. 04-20044-CIV, 2005 WL 3675961 (S.D. Fla. July 11, 2005).

passenger was injured seriously enough to require an investigation. Under Carnival's policy, injuries that only require first aid are classified as "non-reportable" and do not require an accident report and an investigation by the security department. By all accounts, on the ship, the injury to Tesoriero's arm appeared minor.[8] Her arm was not broken and was only treated with basic first aid—ice, a sling, and Tylenol.[9]

In short, nothing in the record smacks of bad faith. Under these facts, Carnival's explanation reasonably suggests that the chair was not destroyed to hide adverse evidence. At most, Tesoriero has provided evidence that Carnival's shipboard medical staff were negligent in not anticipating that her injury could be more serious than it appeared. Mere negligence in losing or destroying evidence is not enough to warrant sanctions. *Bashir*, 119 F.3d at 931. And the right hand not talking to the left is not the same thing as the right hand telling the left to destroy evidence. Accordingly, we conclude that the district court properly declined to draw an adverse inference from Carnival's failure to retain the chair.

---

[8] The dissent's quote from Tesoriero's independent medical examination that her initial x-ray "was read as a hairline fracture" (by whom, he does not say, and we do not know) does not change this fact. Dissenting Op. at 10. Tesoriero does not argue, even once, that her arm was broken. According to her own testimony, she was told it was not broken on the ship, she was told it was not broken on land, and her arm was, in fact, not broken. She was diagnosed with medial epicondylitis and ulnar neurapraxia—a condition that she describes as "tennis elbow"— and Tesoriero does not dispute this conclusion. At this point, of course, we have no doubt that her injury turned out to be serious.

[9] The dissent suggests that this treatment, because it was provided by a physician instead of a layperson, is not really first aid. Dissenting Op. at 8–9. In the context of Carnival's policy, however, first aid refers to the type of care provided, not on who is providing the treatment. We have no hesitation concluding that ice, a sling, and Tylenol together are nothing more than simple first aid in the context of this policy. The fact that an x-ray was taken, as a diagnostic step, to confirm the absence of a fracture does not move the needle.

25

To be sure, we would have little trouble affirming sanctions against Carnival if the factual circumstances were slightly different. For example, if Tesoriero's arm had been visibly fractured, it would be hard for Carnival to convince us that the decision not to report the injury to security was reasonable, or in keeping with its ordinary policy. Similarly, if there were any evidence that Tesoriero requested that the chair be preserved, we would be highly skeptical of a subsequent claim that the chair was disposed of pursuant to a routine policy. In both of those circumstances, the inference that the chair was destroyed to hide adverse evidence would be much stronger than it is here.

We will briefly add that even if there were evidence to somehow support a finding of bad faith, that would not justify the leap that the dissenting opinion takes. To begin, no party has cited a persuasive case to support a presumption of notice as a spoliation sanction, and the one identified by the dissent falls short.[10] But even more critically, we disagree with the dissent's view that "the practical importance of the evidence" supports sanctions in this case. *Flury*, 427 F.3d at 945; *ML Healthcare Servs., LLC*, 881 F.3d at 1307. Here, even if the chair had been

---

[10] We note a few things about the exemplar magistrate judge order cited by the dissent as an example of spoliation leading to an inference-of-notice sanction. First, the sanction imposed was the "least-severe sanction available," and was a "rebuttable, permissible adverse inference that the destroyed evidence would have demonstrated the existence of a dangerous condition" that the defendant knew or should have known about. *In re the Complaint of Boston Boat III, LLC*, 310 F.R.D. 510, 523 (S.D. Fla. 2015) (parenthetical mark omitted). And that light-touch sanction was imposed in a case that involved dramatic evidence of bad faith: for starters, the defendant destroyed critical evidence well after litigation began. Not only that, but the defendant's attorney personally observed and failed to stop ongoing destruction, the plaintiff's attorney was not timely notified of the destruction, and the defendant presented inconsistent explanations for why the evidence was destroyed. *Id.* at 517–23. The differences between those facts and the ones in this case speak for themselves. Indeed, nothing in this case would preclude the sanction applied in that one.

preserved, it is not clear what evidence of Carnival's notice could be deduced from the already-broken piece of furniture.  Joseph Tesoriero testified that there was no outwardly visible defect, Tesoriero herself noticed no problem when she moved the chair back from the vanity, and the photographic evidence confirms that the peg-and-hole assembly—as well as the state of the glue holding it together—would have been obscured before the accident.  In light of the evidence, and given Tesoriero's failure to avail herself of Carnival's offer to inspect an identical unbroken cabin chair from the *Splendor*, we are unpersuaded that her ability to inspect the broken chair would have been so important to the notice issue as to warrant sanctions.  We also note our disagreement with our dissenting colleague's apparent view that because evidence of notice would be necessary for Tesoriero to show a prima facie case of negligence, it must mean that the chair would have provided the evidence.  Dissenting Op. at 18–19.  Respectfully, we fail to see why one leads to the other; while notice has not been shown here, it is not because the chair is missing.

## IV.

In conclusion, Tesoriero did not establish that Carnival had actual or constructive notice that the chair was dangerous.  This is fatal to her case.  Her failure to establish the duty element of her negligence claim cannot be cured by her invocation of the res ipsa loquitur doctrine.  And because she has not shown that Carnival committed sanctionable spoliation of evidence, her case is not saved through an adverse inference sanction.  Accordingly, although we disagree with the reasoning of the district court in some respects, we reach the same result.

**AFFIRMED.**

27

ROSENBAUM, Circuit Judge, dissenting:

When Irina Tesoriero boarded the Carnival *Splendor* to enjoy some special family time, she never expected the costs of her trip to include two surgeries and numerous doctor and physical-therapy appointments totaling more than $120,000 in medical bills. Nor did Tesoriero realize that her cruise would cost her much of the use of her dominant right arm and hand. But that's the price that Tesoriero has paid because a chair on the *Splendor* collapsed as she tried to sit on it.

This case is about who should pay for Tesoriero's damages. Under the law, of course, if Carnival was not negligent, it is entitled to a judgment in its favor, and Tesoriero must shoulder the burden. On the other hand, if Carnival was negligent, then it has a legal obligation to pay for Tesoriero's reasonable damages.

But we will never know whether Carnival was negligent because Carnival destroyed the chair that caused Tesoriero's injuries. So conveniently for Carnival, there is no evidence that Carnival had notice of the chair's dangerous condition. The panel opinion excuses Carnival's destruction of evidence by just accepting Carnival's word that it did not destroy the chair in bad faith. And the panel opinion does so even though Carnival has previously destroyed evidence in other cases and has been warned by a federal court that its destruction of evidence could result in sanctions, Carnival's so-called evidence-preservation procedures are designed to ensure that evidence will be destroyed in at least some cases and in fact have repeatedly resulted in the destruction of relevant evidence, and Carnival has failed

28

to follow its own evidence-preservation procedures in several cases, including this one.

To make matters worse—and in stark contrast to how Carnival allowed the chair here to be destroyed—Carnival calculatedly preserved evidence favorable to it from the moment Tesoriero reported her fall onboard the *Splendor*.

For these reasons and others I explain below, I respectfully disagree with the panel opinion. The record here raises a genuine issue of material fact concerning whether Carnival destroyed the chair in bad faith.

And if a jury were to conclude that Carnival had, in fact, disposed of the chair in bad faith, Tesoriero would be entitled to an inference that the chair was evidence favorable to her and detrimental to Carnival. In particular, that inference could establish that Carnival had notice of—that is, it knew or should have known about—the unsafe condition of the chair.

After all, Carnival testified that it repairs broken chairs when possible. ECF No. 39-1 at 19-20.[1] So an examination of the chair at issue here might have revealed a faulty repair, or it could have shown that the type of defect that occurred here has happened before on the very same chair. It also might have suggested that if, in fact, as Carnival testified, its employees conducted proper daily inspection of the furniture, Carnival should have known about the chair's defect through that program.

---

[1] For reasons of transparency, I include pincite references to the evidence of record. That way, anyone who wishes to follow along from their armchair may evaluate firsthand the evidence I summarize. References are to the district-court ECF number and the CM/ECF-imprinted page number, except where evidence consists of deposition transcripts. In those cases, references are to the page numbers of the deposition transcript, since four deposition transcript pages appear on each CM/ECF-numbered page.

ECF No. 39-1 at 47-48.  Any of these outcomes would have provided evidence that Carnival had notice of the chair's dangerous condition.  And if Tesoriero could have shown an issue of fact concerning notice, her claim would have survived summary judgment.  In short, this record raises a genuine issue of material fact concerning whether Carnival destroyed the chair in bad faith, and that, in turn, necessarily means that it raises a genuine issue of material fact as to whether Carnival had notice of the defect in the chair that injured Tesoriero.

For that reason, Tesoriero is entitled to have a jury decide whether it believes Carnival's version of the story.  So I would vacate the grant of summary judgment and remand for a trial.  Because the panel opinion erroneously allows a judge (without so much as an evidentiary hearing), instead of a jury, to weigh credibility on the paper record and resolve this genuine issue of material fact—whether Carnival destroyed the defective chair in bad faith—I respectfully dissent.

## I.

The panel opinion correctly sets forth the legal principles concerning spoliation.  But it's worth emphasizing that the summary-judgment standard applies equally to spoliation-related facts and other facts material to the resolution of the legal issues before the district court.  After all, "'bad faith' is a question of fact like any other."  *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (citation and internal quotation marks omitted).

So we must view the spoliation-related evidence and any reasonable inferences from it in the light most favorable to Tesoriero, since she is the non-moving party.  *See Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019).

30

That means that if a genuine dispute of material fact exists over bad faith, and a finding of bad faith would support an adverse inference against Carnival about a fact material to the resolution of the merits here, summary judgment must be denied. As I explain below, that's exactly the situation here.

My disagreement, then, lies with the panel opinion's statement of the facts and its application of spoliation law to those facts. Once we consider all the evidence—something the panel opinion did not do—we must conclude that the evidence raises a material issue of fact about whether Carnival destroyed the chair in bad faith. Specifically, a reasonable jury could find that Carnival devised and retained policies and procedures designed to result in the destruction of material evidence in at least some cases, or it created conditions that made compliance with its evidence-preservation policies and procedures unlikely, or both.

If a jury reached any of these conclusions, it reasonably could find that Carnival destroyed the chair here in bad faith. And if a jury made that finding, Tesoriero would be entitled to an adverse inference that Carnival destroyed the chair because an examination of it could have provided evidence that Carnival knew or should have known of the chair's defective condition—a crucial part of Tesoriero's *prima facie* case of negligence against Carnival.

## A.

I begin with a little background against which we must view Carnival's policies and procedures covering the preservation of material evidence involved in an onboard injury. As the panel opinion notes, Carnival conceded in its responses to Tesoriero's requests for admissions that "immediately after the incident was

31

reported [by Tesoriero while onboard the *Splendor*, Carnival] anticipated litigation arising from the accident." ECF No. 65 at 25, 29. Indeed, as Monica Petisco, Carnival's corporate litigation representative, admitted, "anytime anything happens onboard, [Carnival] anticipate[s] litigation." ECF No. 39-2 at 24.

That is certainly clear from the Passenger Injury Statement form that Carnival requires its guests to fill out in their own handwriting as soon as they seek medical attention onboard. *See* ECF No. 44-8. That Carnival demands the injured passenger prepare the form in her own handwriting conveniently renders the form an admission by the passenger for future-litigation evidentiary purposes. *See United States v. Williams*, 837 F.2d 1009, 1014 (11th Cir. 1988). The form also seeks to seal the passenger into the details surrounding the injury, likely before all details are known.

For example, in addition to questions about where and when an injury occurred and how "in detail" it happened, the form asks the passenger to state what she "believe[s] caused this accident" and "what [she] could have done to avoid the accident." *Id.* Then the form requires the guest to identify all witnesses to the accident, whether the guest uses glasses or contact lenses and whether the guest was wearing them at the time of the accident, and "[w]hat kind of shoes" the guest was wearing when the accident happened. *Id.*

Put simply, the Passenger Injury Form appears designed to preserve for Carnival's benefit, from the instant an injury occurs, all evidence from the passenger that might assist Carnival in future litigation. Indeed, the specific information the questions seek suggests that Carnival has learned much from its past litigation about the evidence most helpful to it in litigation.

32

Of course, there is nothing inherently wrong with that.  But those steps differ strikingly from Carnival's policies and actual practices concerning preservation of material tangible evidence that might hurt Carnival and help a passenger in future litigation.  And a reasonable jury might find that fact bears on whether Carnival, in good faith, has developed and executes its policies and procedures to preserve material tangible evidence.

## B.

With this in mind, I review Carnival's applicable policies and procedures. According to Carnival's corporate representatives, Carnival's security department is ultimately responsible for maintaining material tangible evidence.  ECF No. 39-2 at 48; ECF No. 39-1 at 42.  Yet Carnival's security department does not even become involved in deciding whether to preserve such evidence unless an accident report is filed. ECF No. 39-2 at 48.  According to Petisco, Carnival's litigation representative, an accident report can be filed in two circumstances.  First, a guest can "request that [Carnival] create an accident report."  *Id.*  And, second, Carnival "entrusts . . . the [ship's] doctor to make the determination between reportable or non-reportable [accidents]," based on whether an injury requires "[a]nything beyond first aid." *Id.* at 48-49.

The panel opinion simply assumes without any analysis that these policies are reasonable.  But on their face, these policies increase in three ways the likelihood that material evidence will be discarded.  Indeed, as Carnival well knows, history has proven that true.  Carnival's policies have previously resulted in the destruction

of material evidence.  And, in fact, at least one district court has warned Carnival that a pattern of discarding material evidence could support spoliation sanctions.

**1.**

I begin by identifying the three ways Carnival's policies meaningfully increase the odds that Carnival will destroy material evidence.  First, Carnival's housekeeping process has no mechanism requiring housekeeping employees to check with the security department before discarding broken furniture from a guest's room.  Rather, when furniture in a guest's room breaks, Carnival's policy requires housekeeping staff to immediately remove and replace the object in question—even if, as happened here, housekeeping removes the item while the injured passenger remains in the room and waits for help.  ECF No. 39-1 at 41-42.

Once the broken piece is removed, it is taken to be repaired.  *Id.* at 42.  If the furniture cannot be fixed, it is "usually disposed" of.  *Id.*  That does not happen if—and only if—Carnival's security department affirmatively intervenes and preserves the piece.  *See id.*  So unless the security department jumps in to save evidence before the housekeeping department throws it out, evidence is discarded.  But of course, the security department does not intercede if an accident report is not filed.

Second, and compounding this problem, Carnival's shipboard processes falsely cause guests to believe that they have made an accident report when they seek medical attention from the ship's doctor.  As I have noted, when a guest visits the ship's doctor to address an injury, she must fill out a Carnival document called "Passenger Injury Statement."  Besides the other questions the thorough form lists, it asks, "Date [accident] reported," "Name of staff member accident reported to,"

34

"Time reported," and "If not reported immediately, please explain why?" ECF No. 44-8. These questions suggest that a passenger can officially report an accident to any "staff member" and that the passenger has officially reported her injury to Carnival when she fills out the Passenger Injury Statement. So a passenger has no reason to ask whether she must do anything further to make an official report to Carnival to trigger the security department's preservation of material evidence. Some might say this form lulls passengers into a false sense of security that they have fully reported the incident.

Third, Carnival's policy leaving it to the discretion of the ship's doctor to decide whether an accident report should be filed (and the evidence thus preserved), ensures that accident reports will not be filed in at least some cases where evidence should be maintained. Carnival's policy calls for the ship's doctor to prepare an accident report only when the doctor must provide more than first aid. But Carnival does not define what it means by "first aid." Rather, that is up for interpretation by each individual doctor.[2]

---

[2] Standard references do not uniformly define the term "first aid." For example, a medical dictionary defines "first aid" as "[i]mmediate assistance administered in the case of injury or sudden illness by a bystander or other layperson, before the arrival of trained medical personnel." *First Aid*, Stedman's Medical Dictionary (28th ed. 2006). A non-medical dictionary defines "first aid" as "emergency and sometimes makeshift treatment given to someone (as a victim of an accident) requiring immediate attention where regular medical or surgical care is not available." *First Aid*, Webster's Third New International Dictionary, Unabridged (2020), https://unabridged.merriam-webster.com/ (last visited Mar. 25, 2020). Setting aside the fact that a doctor technically does not render "first aid" under either definition, these definitions do not set forth medical standards that identify what treatments, procedures, or remedies are necessarily "first aid" and what are not. As a result, Carnival's policy does not clearly delineate when a doctor should prepare an accident form.

And even if we disregard this shortcoming and assume all doctors abide in precisely the same way by some (unidentified) universally applicable definition of "first aid," the policy wrongly equates a doctor's assessment that an injury requires no more than first aid with the determination that an injury is not serious and the piece of furniture causing it should not be preserved. In fact, as is common knowledge, some injuries, at first glance, may appear minor but later manifest themselves as severe.

Carnival has also not explained why a policy that depends on the provision of "first aid" satisfies its duty to preserve evidence in anticipation of litigation. And the relationship between the two is not obvious to me.

Nor is it obvious to Carnival, since Carnival anticipates litigation "anytime anything happens onboard" and preserves evidence favorable to it in *every* instance, regardless of whether the doctor provides only "first aid." To rubberstamp a policy that allows Carnival to treat plaintiff-favorable evidence in its control differently invites gamesmanship. Indeed, the policy knowingly results in destruction of evidence even though, by requiring the injured guest to fill out the Injury Statement Form to receive medical attention, Carnival simultaneously preserves evidence favorable to itself, in anticipation of litigation, when a doctor does not file an accident report.

### 2.

This case demonstrates some of these pitfalls.

First, this case appears to have involved more than first aid, but according to Carnival, the doctor did not file an accident report. Here, the doctor took X-rays of

Tesoriero's arm.  X-ray equipment is not in any standard first-aid kit I've ever seen.

Plus here, the doctor sent the X-rays off the ship to Miami to be read—a process that

would not be completed until after Tesoriero left the ship.  Seeking consultation from

a specialist physician, like taking X-rays in the first place, seems like more than "first

aid."  (But then again, we can't look to Carnival's policy for guidance on that).  If

the Miami doctor had found a break in Tesoriero's arm, neither Tesoriero nor the

ship's doctor would have known until after the cruise ended.  In fact, it is not clear

the ship's doctor ever would have learned of the break.  But because Carnival left

filing an accident report to the doctor's discretion and, according to Carnival, the

doctor did not do that (more on this later, *see infra* at 14-15), the chair was

discarded—before the ship's doctor even had confirmation about whether

Tesoriero's arm was broken.

As it turned out, according to Tesoriero's medical records, Tesoriero's X-ray

"was read as a hairline fracture."[3]  ECF No. 44-11 at 10.  And her follow-up medical

---

[3] The panel opinion takes issue with this statement because it says that "Tesoriero does not argue . . . that her arm was broken."  *See* Maj. Op. at 25 n.8.  True, she doesn't.  But that misses the point.  The point is that the X-ray taken by the ship's doctor was read by a medical professional as showing a serious enough injury to require more than simple first aid.  As for the derivation of that statement, it comes from Tesoriero's independent medical examination report, which a Board-certified orthopedic surgeon conducted.  More specifically, it appears in his review of Tesoriero's medical records from July 1, 2015, four days after the incident.  The surgeon reported that a medical professional who examined Tesoriero on July 1 stated in Tesoriero's visit notes that Tesoriero "had an [X]-ray on the cruise that was read as a hairline fracture."  ECF No. 44-11 at 10.  Presumably, that refers to the Miami specialist's reading of the X-ray the ship's doctor took, because the ship's medical center advised Tesoriero that the ship's doctor (who told Tesoriero he didn't think her arm was broken but he couldn't confirm) "didn't have full expertise to read an X-ray, and it would be shipped to Miami, and they would give [Tesoriero] an answer," which would happen after she left the cruise ship.  ECF No. 39-3 at 74.  The medical facility Tesoriero visited on July 1 then took a new X-ray that "revealed no acute fracture."  ECF No. 44-11 at 10.  That a new X-ray taken four days after the incident did not show an "acute fracture" does not mean that

care showed that she had "a focus of T2 hyperintensity at the insertion of the common extensor tendon on the lateral humeral epicondyle consistent with a partial tear." *Id.* As a result, Tesoriero was "unable to drive without pain and unable to carry anything."[4] *Id.* By any definition, that is certainly an injury requiring more than first aid.

Second, even if we assume Tesoriero's injury required only mere "first aid" while she was onboard the *Splendor*, there can be no question that Tesoriero, in fact, suffered a serious injury. I have already recounted the lasting pain the injury has caused Tesoriero. And because of her injury onboard the *Splendor*, Tesoriero had to undergo two surgeries, physical therapy, and other medical treatment after her cruise ended—resulting in medical expenses of more than $120,000. ECF No. 44-11 at 14. If the doctor's failure to file an accident report here was consistent with Carnival policy, a reasonable jury could conclude that Carnival's policy is unreasonable, or even that it was created in bad faith. After all, under the panel opinion's analysis, Carnival's policy that ensures destruction of evidence in these

---

an X-ray taken four days earlier did not show a "hairline fracture." By their nature, "hairline" fractures can be difficult to see, and the intervening time between the initial X-ray and the later one could have made any "hairline" fracture that may have existed at one time even harder to see, to the extent that it continued to exist.

[4] Tesoriero also testified,

I can't carry the garbage. I can't carry the laundry. I can't empty or pick up heavy pots. Cooking is very restrictive in terms of getting things in and out of an oven. Carrying groceries, doing grocery shopping, opening a bottle of water, twisting actions. I can't peel potatoes. I can't peel carrots. I can't flip pancakes. I can't put any pressure on—like when you peel an apple.

ECF No. 39-3 at 52.

circumstances is precisely what shields it from potential liability and any consequences of destroying the evidence.

Tellingly, this is not the first case where Carnival has destroyed material evidence, supposedly in accordance with its policies. For example, in *Morhardt v. Carnival Corp.*, Morhardt used a ship hair dryer, which electrocuted him and burned and blackened his hand. 304 F. Supp. 3d 1290, 1292-93 (S.D. Fla. 2017). He immediately went to the ship's infirmary for treatment. *Id.* at 1293. Yet Carnival threw out the hair dryer involved in the incident. *Id.* at 1297.

The district court in *Morhardt* described Carnival's actions as being "a matter of keen concern." *Id.* And the court noted that it was "aware of other cases in which a plaintiff passenger was injured aboard a Carnival cruise ship and the object that purportedly caused the injury was immediately discarded." *Id.* at 1297 n.6 (citing *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962 (S.D. Fla. July 23, 2010)).[5] Significantly, the court "caution[ed] Carnival against establishing a pattern or practice of discarding such objects because such actions could potentially provide a basis for spoliation sanctions or liability in the future." *Id.*

The panel opinion finds it "unclear how . . . three district court cases that decline to offer any relief based on spoliation or discarding evidence should persuade [the panel opinion] that sanctions are appropriate here." Maj. Op. at 23-24 n.7. And somehow, it thinks the fact that "2 of the 3 cases involved collapsing chairs"

---

[5] *See also Hickman v. Carnival Corp.*, No. 04-20044-CIV, 2005 WL 3675961 (S.D. Fla. July 11, 2005) (Carnival "almost immediately" repaired bar stool involved in incident, instead of preserving it).

39

strengthens its view that sanctions are not appropriate here. *Id.* In my view, the opposite is true.

At some point, adherence to policies Carnival knows from past litigation result in the destruction of material evidence—especially when Carnival anticipates litigation and simultaneously employs policies designed to preserve evidence favorable to it—constitutes bad faith. This is particularly the case here because a federal court has already expressly warned Carnival that its continuing failure to maintain material evidence may result in spoliation sanctions. Surely, the mere fact of the existence of Carnival's policies (that it knows result in destruction of material evidence)—even if Carnival complied with them—cannot indefinitely shield Carnival from liability and consequences of any type.

Indeed, we suggested as much when we held that one of the factors relevant to whether spoliation sanctions should be imposed is "the potential for abuse if sanctions are not imposed." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)). Yet to excuse Carnival's destruction of evidence, the panel opinion allows Carnival to continue to hide behind the very policies Carnival knows result in destruction of evidence. A jury should be allowed to determine whether Carnival has reached the point where its policies that have previously proven to result in destruction of evidence can no longer shield it from liability.

## C.

Even if a jury rejected the notion that Carnival's failure to modify its policies to prevent material evidence from being destroyed demonstrates bad faith, a reasonable jury could still conclude that Carnival failed to ensure compliance with its preservation policies here. And a jury that made that finding could conclude that Carnival's failure to abide by its own policies shows bad faith in and of itself.

To begin with, Tesoriero reported her incident with the chair literally at least five different ways to Carnival while she was still onboard her cruise.[6] And after she told Dr. Milos Potkonjak, the ship's doctor, he advised her that a health-and-safety official on the ship would speak with her about her injury. ECF No. 39-3 at 100-01. Even Carnival conceded in its answers to Tesoriero's requests for admissions that "the accident in this case was reported to the Defendant cruise line on the cruise on which the incident occurred." ECF No. 65 at 25, 29. Yet the chair was not preserved.

---

[6] First, Tesoriero's husband Joseph called Guest Services, reported the incident, and asked for immediate medical attention. ECF No. 39-3 at 65-66; ECF No. 44-3 at ¶ 5; ECF No. 39-6 at 3. Second, when the cabin steward went to the Tesorieros' room and removed the broken chair, the Tesorieros told him that Tesoriero believed she had broken her arm and that they had called for help, and they asked him whether a doctor would be coming to the room. ECF No. 39-3 at 67. Third, when no doctor arrived at the Tesorieros' room after half an hour, the Tesorieros went to the infirmary to seek medical attention. *Id.* at 72-73. It was closed, but they found a nurse and told her about Tesoriero's injury. *Id.* at 73. She got Dr. Potkonjak, and the Tesorieros told him about the injury. *Id.*; ECF No. 44-3 at ¶ 6. Fourth, Dr. Potkonjak gave the Tesorieros a Passenger Injury Statement to fill out, which reported the incident yet again. ECF No. 39-3 at 68; *see also* ECF No. 44-8. And finally, while still onboard the cruise, Tesoriero also reported her injury to the front-desk supervisor on the ship, seeking a document stating that she would get her X-rays back. ECF No. 39-3 at 100. Carnival's responses to Tesoriero's interrogatories also indicate that Tesoriero "interacted with . . . I Care personnel" about her injury, ECF No. 39-6 at 3, but it is not clear whether the "I Care personnel" she spoke with included any of the Carnival employees previously identified.

41

Despite all these reports to Carnival employees in various cruise line positions, Carnival made no effort to preserve the chair involved in the injury. And though the ship's doctor advised Tesoriero that a health-and-safety official would speak with her concerning her injury, no one ever did.

This reference to a health-and-safety official appears to be a reference to Carnival's security department. If so, that means the doctor apparently thought he was making a report to the security department, even though Carnival has no record of any such report. But once again conveniently for Carnival but inconveniently for Tesoriero, sixteen days after Tesoriero's injury occurred, Carnival did not renew Dr. Potkonjak's contract and provided "his last known address" as, in its entirety, "Biograd, Croatia."[7] ECF No. 39-6 at 3. As a result, checking with Dr. Potkonjak would appear to be difficult, if not impossible.

If a reasonable jury concluded that the destruction of the chair was a consequence of Carnival's failure to follow its own policies, it could also reasonably find that Carnival's shortcomings resulted from its bad faith. First, the mere fact that Tesoriero made five different reports of the incident and the chair was still destroyed—even though Carnival anticipated litigation—could reasonably be construed as evidence that Carnival acted in bad faith when it failed to follow its policies here.

---

[7] Tesoriero testified that Dr. Potkonjak informed her when she went to the medical center that "it was his first day on the ship." ECF No. 39-3 at 73-74. If that also meant that the date of Tesoriero's injury was Dr. Potkonjak's first date of employment with Carnival, then Carnival employed Dr. Potkonjak for a total of seventeen days.

42

Second, that Dr. Potkonjak apparently believed he reported the incident to the security department but no record of that was ever made and that he is now unavailable for questioning similarly could be viewed as suggesting that Carnival acted in bad faith when it threw away the chair.

And finally, this is not the first case where Carnival's failure to follow its own preservation policies has resulted in the destruction of evidence.  In *Walter*, Carnival discarded a deck chair that collapsed under the passenger there.  2010 WL 2927962, at *1.  The chair in that case was lost, even though Carnival employees prepared an accident report.  *Id.* at *2.  And just over a year ago, Carnival lost CCTV footage of a guest's fall, even though Carnival conceded it had a duty to preserve that evidence.  *Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 WL 6335178, *1 (S.D. Fla. Dec. 4, 2018).  The magistrate judge considering a motion for sanctions against Carnival in that case described Carnival's position as (1) "'[c]'est la vie' ('that's life,' or 'that's how things happen') and (2) 'stuff happens.'"[8]  *Id.*

No wonder Carnival has that attitude.  Carnival keeps discarding material evidence, and that keeps working to its advantage.  So why would it ever do anything to remedy its compliance with its own policies?

A reasonable jury viewing these facts could conclude that Carnival's failure to strictly adhere to its stated policies betrayed bad faith on Carnival's part.

And if a jury reached that conclusion, Tesoriero would be entitled to an inference that Carnival destroyed the chair because it would have provided evidence

---

[8] *See also Wilford v. Carnival Corp.*, No. 17-21992-CIV, 2019 WL 2269155 (S.D. Fla. May 28, 2019) (Carnival could not locate and produce X-rays its medical personnel took in an onboard medical clinic after the plaintiff slipped and fell onboard).

43

that Carnival knew or should have known of the chair's unsafe condition. Though many courts have observed that "courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence," *In the Matter of: the Complaint of Boston Boat III, LLC*, 310 F.R.D. 510, 521 (S.D. Fla. 2015) (citations and internal quotation marks omitted) (collecting cases); *see also Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998), here, it is clear that the missing chair could have provided Tesoriero with critical evidence that Carnival knew or should have known that its chair was defective.

As I have explained, an examination of the chair that actually collapsed could have revealed that Carnival had previously fixed that same chair in the same place. Or it could have shown that Carnival had previously repaired another part of the chair, which caused stress on the joint that separated. Or it could have betrayed that its housekeeping staff did not in fact move and check the furniture daily, as Carnival testified it did, because if it did, it should have been aware of the chair's defective condition. Any of these revelations would have shown that Carnival either knew or should have known that the chair was not fit for continued use.

And contrary to the panel opinion's suggestion, *see* Maj. Op. at 26-27, it is obvious that examination of a similar chair would not reveal any of these things that, if they existed, would have occurred in only the chair involved in the incident.

Joseph's amateur photographs do not save the day for Carnival, either. *See id.* at 27. They are a poor substitute for the actual chair, which could have permitted sampling of the glue that allowed the joint to separate (as well as examination for

44

more than one application of glue, as in a repair of the chair joint) and inspection of the rest of the anatomy of the chair to determine whether a repair to a part of the chair that was not photographed could have placed extra stress on the part of the chair that separated.

Similarly, I respectfully disagree with the panel opinion that Joseph's brief looking over of the chair while his wife was writhing in pain and the two were waiting for medical attention qualifies as a thorough examination that would have revealed any of these problems with the defective chair if they existed. *See id.*

As for the panel opinion's contention that an examination would not have revealed that housekeeping staff knew or should have known of the defect because "Tesoriero herself noticed no problem when she moved the chair back from the vanity," *id.*, there is a significant difference between pulling a chair out about a foot from a vanity as a prerequisite to grooming, and cleaning and checking furniture as part of job duties, as the Carnival staff was charged with doing. Plus, even if we assume no difference, Tesoriero's failure to notice a problem with the chair when she pulled it out would not establish that Carnival had not previously repaired that same chair or that the chair had not broken before in the same place.

Notice is the one thing that Tesoriero could not establish on summary judgment without the benefit of an examination of the chair. Because showing notice is an element of her claim for negligence, and because inspecting the chair may well have provided the necessary evidence that Carnival knew or should have known of the chair's defective condition, the chair qualifies as crucial evidence.

45


The panel opinion suggests that proof of notice is somehow exempt from the regular rules that govern the imposition of spoliation sanctions. *See id.* at 26. But the only support it offers for this novel notion is its assertion that "no party has cited a persuasive case to support a presumption of notice as a spoliation sanction, and the one identified by the dissent falls short." *Id.*

Most respectfully, the panel opinion is doubly wrong. First, as the panel opinion indicates, sanctions for bad faith are appropriate when "the practical importance of the evidence" is significant. Maj. Op. at 21 (quoting *Flury*, 427 F.3d at 942). It does not make a difference why the evidence is important; all that matters is that the evidence has "practical importance." Obviously, evidence that proves a necessary element of a plaintiff's *prima facie* case is "practical[ly] important" when the plaintiff cannot establish that element without it. *See Palmas & Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.*, 881 So. 2d 565, 582 (Fla. Dist. Ct. App. 2004) (noting that "where evidence necessary to prove a *prima facie* case is missing due to actions of a party, an essential element of a claim may be presumed" (citing *Pub. Health Tr. of Dade Cty. v. Valcin*, 507 So. 2d 596, 599 (Fla 1987))).[9] Notice is a necessary element of Tesoriero's *prima facie* case of negligence. And as I have explained, an examination of the defective chair may well have proven that Carnival knew or should have known of the chair's condition. So upon a finding of bad faith,

---

[9] We have explained that while federal law governs the imposition of spoliation sanctions, our opinion concerning sanctions can be "informed by [state] law" when, as here, it is consistent with federal spoliation principles. *Flury*, 427 F.3d at 943, 944.

it would have been appropriate for a court to give a spoliation sanction concerning that necessary evidence.[10]

Second, courts have in fact awarded spoliation sanctions when destroyed evidence might have proven notice. In *Boston Boat*, for example, the court imposed a spoliation presumption "that the destroyed evidence would have demonstrated the existence of a dangerous condition ***which Boston Boat knew about, should have known about or created***." 310 F.R.D. at 523 (emphasis added). The panel opinion's attempt to distinguish *Boston Boat* on the dual bases that it imposed only a "rebuttable, permissible adverse inference" and that it "involved dramatic evidence of bad faith" once again misses the point. The point here is that when a court finds that evidence was destroyed in bad faith, spoliation sanctions can appropriately be imposed to establish a presumption of notice where the destroyed evidence itself, had it not been discarded, could have proven notice.

Here, for the reasons I have explained, the defective chair that Carnival destroyed may well have proven that Carnival had notice of the chair's dangerous condition, had Carnival not discarded the piece of furniture. So given an opportunity

---

[10] The panel opinion asserts that I espouse the position "that because evidence of notice would be necessary for Tesoriero to show a prima facie case of negligence, it must mean that the chair would have provided the evidence." Maj. Op. at 27. Nonsense. No fair reading of my dissent could support the panel opinion's claim. Indeed, as I have explained two other times in this dissent, *see supra* at 2, 17, an examination of the defective chair in this case could have yielded evidence that Carnival knew or should have known of the chair's dangerous condition—that is, evidence of notice. Those explanations amply demonstrate the practical importance of the destroyed chair. *See Kronisch*, 150 F.3d at 128 ("[C]are should be taken not to require too specific a level of proof [because] . . . holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction." (citation and internal quotation marks omitted)).

47

to evaluate the witnesses and other evidence at trial, a jury reasonably could have concluded, upon a sanctions-based presumption instruction, that an inspection of the chair would have revealed that Carnival knew or should have known of its dangerous condition. Since that is the case, particularly on a motion for summary judgment, where we must construe the facts in favor of the non-moving party, Tesoriero has established a material issue of fact concerning whether Carnival discarded the chair in bad faith.

Because a material question of fact exists as to the bad-faith issue, the district court should not have granted summary judgment. Rather, the court should have allowed a jury to resolve the bad-faith question of fact, along with all the other disputes of relevant fact in the case.[11] *Vodusek v. Bayliner Marine Corp*., 71 F.3d 148, 157 (4th Cir. 1995) ("We conclude that the district court acted within its discretion in permitting the jury to draw an adverse inference if it found that Vodusek or her agents caused destruction or loss of relevant evidence. Rather than deciding the spoliation issue itself, the district court provided the jury with appropriate guidelines for evaluating the evidence."); *Kronisch*, 150 F.3d at 128 ("We believe that plaintiff has produced enough circumstantial evidence to support the inference that the destroyed MKULTRA files may have contained documents supporting (or potentially proving) his claim, and that the possibility that a jury would choose to

---

[11] At the very least, the district court should have held an evidentiary hearing on the issue instead of resolving the material issue of fact against Tesoriero on the papers. *Cf. McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1311 (11th Cir. 1998) (noting in the context of a motion for preliminary injunction that it is an abuse of discretion to fail to hold an evidentiary hearing where facts central to a party's claims are disputed); *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1216 (11th Cir. 2009) ("Because the material facts relating to the personal jurisdiction issues were not in dispute, there was no need for an evidentiary hearing.").

48

draw such an inference, combined with plaintiff's circumstantial evidence, is enough to entitle plaintiff to a jury trial."); *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) ("A 'spoliation' instruction, allowing an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other." (citing 4 L. Sand et al., *Modern Federal Jury Instructions* § 75.01 (instruction 75-7), at 75-16 to -18 (2010))).

The panel opinion simply concludes that Carnival acted consistently with its policies and that its policies do not "somehow establish bad faith." Maj. Op. at 23. But for the reasons I have explained, the record viewed in the light most favorable to Tesoriero cannot support that conclusion. So vacatur of the district court's entry of summary judgment and remand for trial is warranted here.

## II.

Because Tesoriero has shown a material issue of fact with respect to bad faith concerning Carnival's disposal of the chair, summary judgment should not have been granted in this case. I therefore respectfully dissent.

49